19-1337

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

OFFICE DESIGN GROUP

Plaintiff-Appellant,

v.

UNITED STATES; CUNA SUPPLY, LLC;

GOVSOLUTIONS, INC.,

Defendant-Appellee.

---

CORRECTED APPEAL FROM THE UNITED STATES COURT OF
FEDERAL CLAIMS, CASE NO. 18-1147C
DECISION BY HONORABLE ROBERT H. HODGES

---

**BRIEF OF PLAINTIFF-APPELLANT OFFICE DESIGN GROUP**

Joseph Whitcomb, Esq.
Whitcomb, Selinsky, McAuliffe, PC
2000 Colorado Boulevard
Tower One, Suite 9500
Denver, CO 80222
Telephone: (303)534-1958
Fax: (303)534-1949
E-Mail: joe@whitcomblawpc.com

Attorney for Plaintiff-Appellant

February 28, 2019

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant, Office Design Group, certifies the following:

1. The full name of every party represented by me is:

   Office Design Group

2. The name of the real party in interest represented by me is:

   Office Design Group

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

   Whitcomb, Selinsky, McAuliffe, P.C. (Joseph A. Whitcomb, Timothy J. Turner)

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).

# **Table of Contents**

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE................................................................2

    Procedural History and Factual Record............................................2

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT .........................................................................................9

  I.   STANDARD OF REVIEW..........................................................9

  II.  THE VA DISPARATELY EVALUATED ODG'S PROPOSAL AND FAILED TO FAIRLY AND EQUITABLY EVALUATE THE PROPSAL PURSUANT TO THE STATED EVALUATION CRITERIA. ..........................11

    i.   Examples of Disparate Evaluation and the VA Holding ODG to an Exacting Standard......................................................................14

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................30

CERTIFICATE OF SERVICE .............................................................31

COFC Decision……………………………………………………………32

Page(s)

# **TABLE OF AUTHORITIES**

Alabama Aircraft Indus., Inc.-Birmingham v. United States,
 586 F.3d 1372 (Fed. Cir. 2009) ......................................................12
Alfa Laval Separation, Inc. v. United States,
 175 F.3d 1365 (Fed. Cir. 1999) ......................................................13
Banknote Corp. of Am. v. United States,
 56 Fed. Cl. 377 (2003) .......................................................... 14, 17, 19
Bannum, Inc. v. United States,
 404 F.3d 1346 (Fed. Cir. 2005) ................................................ 12, 13
Centech Grp., Inc. v. United States,
 554 F.3d 1029 (Fed. Cir. 2009) ......................................................12
Domenico Garufi v. United States,
 238 F.3d 1324 (Fed. Cir. 2001) ......................................................13
Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ......................................12
Orion Tech., Inc. v. United States,
 704 F.3d 1344 (Fed. Cir. 2013) ......................................................12

Statutes

5 U.S.C.A. § 706 (West) ......................................................12
28 U.S.C.A. § 1295(a)(3) (West) ......................................................4
28 U.S.C.A. § 1491(b) (West) ......................................................4

Rules

CTAF Rule 47.5 ......................................................4
FCL CT Rule 52.1 ......................................................4
Fed. Cir. R. 47 ......................................................2
Fed. R. App. P. 4(a)(1)(B) ......................................................4
Fed. R. App. P. 32(a)(6) ......................................................33
Fed. R. App. P. 32(a)(7)(B)(iii) ......................................................33
Fed. R. App. P. 32(a)(7)(C) ......................................................33

Regulations

48 C.F.R. § 1.602-2 ......................................................14

## STATEMENT OF RELATED CASES

Pursuant to CTAF Rule 47.5, Appellant states: (a) No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court; (b) The title and number of the case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal: None.

## JURISDICTIONAL STATEMENT

This appeal stems from the Judgment on the Administrative Record entered by the United States Court of Federal Claims (COFC) on October 26, 2018 pursuant to FCL CT Rule 52.1. The COFC had subject matter jurisdiction over this action pursuant to 28 U.S.C.A. § 1491(b) (West). Plaintiff- Appellant Office Design Group, timely filed its Notice of Appeal on December 15, 2018, within the 60-day period established by Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C.A. § 1295(a)(3) (West), as an appeal from a final decision of the Court of Federal Claims (COFC).

## STATEMENT OF THE ISSUES

1.    Contracting officers and source selection authorities (SSAs) are required to evaluate proposals from different offerors fairly and equitably. In the present case, the SSA afforded points in a scoring rubric to other offerors for

responses similar to ODG's and for which the SSA did not give ODG points. Was the VA's evaluation of ODG's proposal arbitrary, capricious and contrary to law?

2.      Even if the VA disparately evaluated ODG's proposal, ODG must have been prejudiced for the courts to grant relief. The VA's SSA only afforded ODG 12 points, of a possible 66, and 39 points were required to be technically acceptable and to be included in the IDIQ. Did the VA's disparate evaluation prejudice ODG?

## STATEMENT OF THE CASE

**Procedural History and Factual Record**

On May 5, 2017, the VA posted Solicitation Nos. VA119-17-R-0260, VA119-17-R-0261, VA119-17-R-0262, VA119-17-R-0263, and VA119-17-R-0264 seeking to establish IDIQ contracts under which fixed-price task orders would be issued for an array of healthcare furniture and various other related services at facilities in five regions across the country.[1] Each solicitation was set-aside for verified Service Disabled Veteran Owned Small Business (SDVOSB) concerns. Appx14-15. The VA estimated each contract at a ceiling of $499 million. An SDVOSB having the required capabilities had the option of submitting a proposal for one, multiple or all of the RFPs for the applicable regions. The VA

---

[1] Region 1, Northeast, Region 2, Southeast, Region 3, Midwest, Region 4, Southwest, and Region 5, West Coast.

initially sought to award three to five IDIQ contracts. Outside of general geographic variances, the solicitations were identical.

The solicitations contained three primary evaluation factors: Technical Capability, Past Performance, and Price. Appx19. For evaluation purposes, the VA deemed Technical Capability more important than Past Performance, and Past Performance more important than Price. When combined, the VA measured Technical Capability and Past Performance significantly more important than Price. Id. Accordingly, the VA utilized a best-value trade-off selection practice to establish the awards process. Factor 1: Technical Capability listed four subfactors, one of which, the Service Narrative, required a contractor to meet all services defined in the Statement of Work (SOW). Appx19-20. The required Service Narrative was to touch upon all elements under SV1: Furniture, Design, and Installation Support Services; SV2 Installation and Reconfiguration Services; SV3 Industrial Design Services; SV4: Advanced Project Management Turn-key with Furniture. Appx20. Each solicitation then listed "key elements" for a prospective offeror to ensure a submitted proposal covered:

    a. Provide a staffing plan to include qualifications and experience working in a healthcare environment for key personnel (Project Manager/lead installer and Interior Designer(s).

    b. Describe the process of inventory, cataloging, protecting existing VA furniture and providing temporary storage for existing furniture. Include any materials that will be used to protect the furniture from any damage while in contractor's possession.

    c. Describe the process of protecting VA property (building) during installation. Include any materials that will be used to protect the building, architectural elements, and finishes or previously installed furniture.

    d. Describe process for making corrections during final walkthrough and documenting punchlist items with COR.

    e. Describe the process used for warranty repairs.

    f. Describe Interior Designer's experience and qualifications working on healthcare facilities and what hardware and software that will be used to produce digital and hard copy drawings of design work and prepared installation drawings.

    g. Describe technical capabilities of staff producing AutoCAD/and or PDF drawings of the as-built furniture installation.

Id. The solicitations included numerous other attachments, sample drawings and various questionnaires. Attachment 15 specifically acted as a guide for evaluators, posing a series of questions related to each service requirement, SV1 through SV4, under the Technical Capability factor. Appx27-28. If after evaluating each of the key elements under this Technical Capability subfactor, the SSA found an offeror's responses "unacceptable," or any other subfactors as "unacceptable," then it deemed the overall technical rating as "unacceptable."[2] Appx20. The record demonstrates that the SSA determined a passing score to be 39 out of a maximum

---

[2] The SSA also scored other aspects of a contractor's proposal including for submitted sample project and for Minimum Technical Requirements (MTR) Self Certification. ODG received Outstanding ratings for both its sample project and MTR Self Certification. ODG received an Acceptable rating on its submitted Product Literature information. Appx38-39.

score of 66. Id. The SSA considered technical capability combined with program management, past performance, and price to collectively ascertain the "best value" to the agency. Appx29.

ODG, being a verified SDVOSB concern with the necessary industry experience, submitted a bid for each of the RFPs by the June 19, 2017 cutoff date. The VA received 19 responsive proposals, including four proposals from separate contractors (each one ultimately receiving an IDIQ award) that were completely identical to one another. Appx35. The agency completed source selection in mid-December 2017 and issued contracts. Id. On December 14, 2017, the VA sent ODG a Notice of Intent to Award. In the notice, the VA reported its finding that ODG was technically unacceptable for failure to provide "complete details or support" on multiple questions related to SV1 through SV4 posed on attachment 15. Id. ODG requested a debriefing on December 15, 2017, and the VA conducted a formal debriefing via telephone on December 19, 2017. On December 26, 2017, ODG timely filed a GAO bid protest (GAO File B-415853-57), which the agency ultimately dismissed as academic due to the VA issuing a notice of intent to conduct a corrective action. In the Notice of Corrective Action, dated January 25, 2018, the VA stated that it would reevaluate all proposals and make new award decisions. Appx2191.

The VA then went dark, taking no action on the procurement but allegedly taking three days in February to re-evaluate the proposals in line with a new, but undisclosed corrective action. On April 3, 2018, the agency issued ODG another Unsuccessful Offeror letter essentially repeating the basis for finding the company technically unacceptable in December 2017. Appx36-39. ODG requested a formal debriefing under FAR 15 from the contracting officer (CO) on April 4, 2018. The VA's contracting office responded the following day providing the obligatory debriefing but offering only a verbatim rehashing of the first debriefing. Appx41-43. On April 10, 2018, ODG again sought a remedy at the GAO. Appx123. On July 16, 2018, the GAO issued its decision denying ODG's protest because it sought to avoid substituting its judgment for the VA's evaluation, good or bad. Appx142-146.

ODG then timely filed a protest with the COFC. Honorable Judge Hodges subsequently denied ODG's Motion for Judgment on the Administrative Record in a decision issued on October 26, 2018. See Office Design Group v. U.S., Case No. 18-1147C. VCG timely filed this appeal.

## SUMMARY OF ARGUMENT

Both the GAO and the COFC have failed to hold the VA accountable for its inconsistent and disparate evaluation process. The VA engaged in a process wrought with errors, which ultimately led to ODG losing an award it clearly had

the ability to perform. ODG's ability to perform was clearly evidence by its outstanding past performance and a Sample Project submitted with its proposal that the VA rated "Outstanding." A Sample Project ODG created from the technical data provided that the VA then somehow found unacceptable.

The Source Selection Authority (SSA) performed a disparate assessment of ODG's proposal measured against the nine bidders awarded contracts to compete for subsequent task orders. ODG's proposal compares favorably to awarded bids, both in providing specific and general responses to the technical factors, especially those related to the questions with point values in Attachment 15. Yet, the SSA did not afford ODG any points for responses for which others received the full points allotted. Because of this disparate evaluation, ODG fell below the 39-point threshold necessary to attain an acceptable technical rating and, thus, an award. Because the procurement is an IDIQ, the specific VA requirements are still forthcoming, and therefore the VA held the awardees' procurement to a different and less exacting standard than it did ODG's. Furthermore, if the SSA had evaluated the bids equally and fairly, ODG would have received the necessary points to qualify for an award.

Finally, and most troubling, the SSA awarded contracts to four contractors submitting identical bids. The Government has argued that the SSA performed its duties under the FAR, reporting the possibility of collusion to the DOJ. However,

the identical bids failed to give the SSA pause despite extensive review. Regardless of whether the four contractors colluded or simply hired the same proposal writer, the identical submissions contain purely generic information that provide the VA no specific insights as to whether each individual contractor possesses the ability to procure and deliver furniture. The VA could not have learned anything from those identical proposals, except that each of those offerors were capable of either colluding with one another to submit identical proposals or had the misfortune of hiring the same proposal writer. This did not make the VA pause, but rather, prompted the agency to award those duplicate proposals perfect scores.

The SSA did this while faulting ODG for not providing enough detail in its technical proposal for an IDIQ. The Court should keep in mind when considering its decision that other than the Sample Project for which the SSA rated ODG outstanding, the solicitation for this IDIQ offered no specific furniture requirements, dates, or locations. ODG was tasked to relate with specificity how it was, for example, going to protect as yet undisclosed furniture for delivery in yet undisclosed locations. The Court should find that ODG's proposal responded with generalities to general requirements and the VA responded by withholding points it otherwise afforded the awardees. These actions defy logic and illustrate how ODG's proposal was disparately evaluated.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court "review[s] the grant or denial of a judgment on the administrative record without deference." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013). That is, this Court "reapplies the 'arbitrary and capricious' standard" of 5 U.S.C.A. § 706 (West) to the procurement decision. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)) (alteration in original).

Moreover, this Court may set aside a procurement decision if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Centech Grp., Inc. v.

<u>United States</u>, 554 F.3d 1029, 1037 (Fed. Cir. 2009), citing <u>Impresa Construzioni</u>

<u>Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Finally, if the Court determines that an agency acted without a rational basis,

it must then determine whether "the bid protestor was prejudiced by that conduct."

<u>Bannum, Inc</u>, 404 F.3d at 1351. The plaintiff must show prejudice by

demonstrating "that there was a substantial chance it would have received the

contract award but for [the agency's procurement] error." <u>Alfa Laval Separation,</u>

<u>Inc. v. United States</u>, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citation

omitted); see also <u>Bannum, Inc.</u>, 404 F.3d at 1353.

Based upon the foregoing, to prevail on this bid protest, ODG must show

that the VA's decision was arbitrary, capricious, an abuse of discretion, otherwise

not in accordance with law, lacked a rational basis, or constituted a violation of

applicable statues or regulations. Moreover, ODG must show that but for the

arbitrary and capricious decision it had a substantial chance of winning the

contract, which in this case would allow it to bid on future task orders. The VA's

multiple failures to fairly and consistently evaluate ODG's proposal was arbitrary,

capricious, and lacked a rational basis. Had the VA conducted a fair and consistent

evaluation ODG would have received one of the allotted awards for the IDIQ

contract. For these reasons, ODG asks the court to sustain the bid protest, overturn

the COFC ruling, and order the VA to conduct a consistent and equal evaluation of the submitted bids with a keen eye to the four identical submissions.

## II.   THE VA DISPARATELY EVALUATED ODG'S PROPOSAL AND FAILED TO FAIRLY AND EQUITABLY EVALUATE THE PROPSAL PURSUANT TO THE STATED EVALUATION CRITERIA.

"[I]t is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004), aff'd, 365F.3d 1345 (Fed. Cir. 2004). A contacting officer must "ensure that contractors receive impartial, fair, and equitable treatment." 48 C.F.R. § 1.602-2.

Here, the VA's decision to deny ODG an IDIG contract was arbitrary and capricious. The SSA unequally applied the evaluating factors described above, holding ODG to a more exacting standard. Moreover, the SSA simply ignored the weaknesses of some of the awardees' proposals, including the eerie exactness of four proposals. The SSA accepted generic responses from awardees to the subfactor questionnaires (i.e. Attachment 15) under the technical capability category; answers similar to those provided by ODG. ODG received zero points for many of its responses that were at least as adequate as those for which awardees received maximum points. There is no rational basis for the VA to apply multiple and inconsistent standards to evaluate proposals. The point-driven factors

combined total juxtaposed with an offeror's price represented what the SSA

evaluated to determine the "best value" for the government in this matter. But the

evaluation criteria essentially stayed set in stone despite the government's assertion

that it was engaging in a corrective action to remedy its deficiencies in the

procurement process.

ODG's first dismissed protest and second protest at the GAO involved the

same basic complaint—the VA's clear failure to provide a fair and equitable

assessment of ODG's proposal under the terms specified in the solicitation. That is,

the SSA held ODG's proposal to a much more demanding standard that it did those

from other offerors, specifically the awardees.

In its Notice of Intent to Award and debriefing, the VA related that ODG's

proposal was technically unacceptable, because, under Subfactor 3:

> "Subfactor 3 Attachment 15: Service Requirement of SOW: **Unacceptable**[3]
> The Offeror's response to the service technical requirements missed the
> majority of the requirements under SV1- SV4. (See narrative below). The
> consensus score for this section is 12 out of 66 points
> (UNACCEPTABLE)."

Appx37. The Notice then details each of the ways ODG's proposal did not satisfy

the criteria in Attachment 15. Appx37-38. However, the Evaluation Factors and

Sub-factors in the RFPs exclude any mention of Attachment 15 and never

---

[3] The SSA relied on a point system rather than a specific defintion to determine
whether a proposal was "Unacceptable." Offerors had to achieve a minimum
number of points under each evaluating factor to receive an adjectival rating above
"Unacceptable."

explicitly state that a failure to answer the questions in that attachment will result in a determination that the proposal is technically unacceptable. Moreover, the words "Attachment 15" only appear in the Solicitation once, in the Table of Contents. The Q&A provided during the procurement process states that Attachments 8 and 15 are informational only, checklists used to evaluate proposals. Appx49. The words "complete details" also do not appear anywhere in the solicitation. [4]   However, ODG's alleged failure to provide "complete details" in response to questions that were not a part of the evaluation criteria was the VA's sole reason for rejecting ODG's technical proposal in December 2017. Now, after reevaluating proposals, the VA offered the same reasoning, albeit differently packaged. Appx37, Appx41.

The problem for the VA, is that it never announced, as it must, that it planned to use responses to Attachment 15 (or Attachment 8) as the rubric against which proposals were scored and evaluated. Thus, the VA's actions violate the FAR and are arbitrary, capricious, contrary to law, and unsupported by the facts.

---

[4] The December 17, 2017 Notice of Award Letter, which is not in the Administrative Record states:
"Subfactor 3 Attachment 15: Service Requirement of SOW: **Unacceptable.** The information included in the proposal did not provide *complete details* or support on five question under SV1, nine questions under SV2, seven questions under SV3, and nine questions under SV4." (emphasis added).

### i. Examples of Disparate Evaluation and the VA Holding ODG to an Exacting Standard.

Section (3) of the Evaluation Criteria for each RFP reads:

> The Government will evaluate the contractor's Service Narrative to be able to meet all services as defined in the Statement of Work. This must cover all services required under SV1 Furniture, Design, and Installation Support Services; SV2 Installation and Reconfiguration Services; SV3 Industrial Design Services; SV4 Advanced Project Management Turn-key Services with Furniture.

Appx19-20. Section 3 (referred to in the April 18, 2018 Notice as Subfactor 3) of the Solicitation states "Key elements are listed below:" Id. at 20. Under each "Key element" listed below is ODG's corresponding submission. While ODG does not stipulate that a failure to provide a response to each "Key element" should result in a finding that its proposal was technically unacceptable, the evidence demonstrates that ODG submitted a written narrative that satisfied the technical requirements and should have received the associated points.

**Example One:**

**Solicitation Key Element:** "Provide a staffing plan to include qualifications and experience working in a healthcare environment for key personnel (Project Manager/lead installer and Interior Designer(s)." Id.

**ODG Response**: Qualified Staff - Assigns dedication & qualified staff to all VA Projects:

    - Project Managers have at least 10 years of experience.
    - Interior Designer has at least 10 years of experience.
    - Installation Supervisors have at least 5 years of experience.

Training - Ensure that all staff is trained on the most current technology and manufacturer offerings within the industry for proper design and installation completion.

- Installers are trained on specific manufacturer installations procedures.

 - Each VA Project is assigned a dedicated Project Manager that works
Personnel with VA representatives during all aspects of a project from kick-off through completion ensuring that data is captured through one source eliminating potential missed information when through multiple POC's.

- The dedicated Project Manager coordinates efforts of all personnel to include installers, movers, designers, and the back-office procurement team ensuring that all requirements on the project are addressed and completed.

Appx59. The SSA assigned two points to another offeror's staffing plan

for each subfactor SV1 through SV4 for a possible total of 6 points. That offeror,

A. Pomerantz, provided a Staffing Plan comparable to ODG's (i.e. providing a

general organizational chart, listing expertise and years of service of its

employees) and directing attention to its submitted Sample Plan for more

comprehensive details[5]. Appx68, Appx75. Further, A. Pomerantz only addressed

the staffing plan directly under SV3 – Industrial Design. Id. However, the SSA

---

[5] The Sample Project allowed the VA to analyze a contractor's proposal in hypothetical action. That is, all the efforts a contractor input into its bid regarding technical ability to manage the RFP was on display for evaluation in the Sample Project. This is why so many contractors referenced the document in their respective bids. ODG received a mark of outstanding on its Sample Project, yet only 12 points (needing 39) out of 66 on the Attachment 15 Questionnaire. The VA did not provide ODG any explanation for this contradiction.

awarded A. Pomerantz two points, the maximum number under that section, for providing a staffing plan for each section: SV1, SV2, SV3, and SV4. Despite providing analogous general information, the SSA awarded ODG zero points for each subfactor.

Awardee Veteran Office Design's (VOD) proposal does not contain a meaningful Staffing Plan beyond what ODG offered. Appx81-82. Further, VOD's personnel qualifications statement almost mirrors ODG's response above. Still, VOD received all 6 points. Next, the four awardees that submitted identical proposals never mention a "staffing plan" for any subfactor, providing instead a remedial organizational chart. Each such awardee, with the same generic staff and organizational chart (no difference apparently in each individual company's management or employees) received two points for each section, for a total of six points.[6]

The SSA did not provide a rational explanation for the disparate treatment. As the evidence above shows, the SSA clearly held ODG to a different and more exacting evaluation standard and, thus, violated the FAR by not fairly and equally assessing the proposals.

**Example Two:**

---

[6] In fact, each of the proposals received the maximum points available (i.e. 66) for the four subfactors, SV1 through SV4.

**Solicitation Key Element**: Describe the process of inventory, cataloging, protecting existing VA furniture and providing temporary storage for existing furniture. Include any materials that will be used to protect the furniture from any damage while in contractor's possession. Appx20.

**ODG Response:** The only mention of existing furnishing in the SOW is as follows, "Contractor may be required to remove and/or relocate existing VA furnishings in coordination with VA Logistic Management Service and Interior Designer per the task order SOW." Appx59.

ODG intended to provide a plan for protecting the equipment once the VA issued a Task Order, which is normal practice in the industry. Any plan ODG provided prior to that would have been necessarily general at best. Without knowing what furniture, the VA would need protection for, no bidder would be able to provide a specific protection plan.

Awardee GovSolutions merely parrots the above key element in its proposal but discusses absolutely nothing regarding existing VA furniture. Parroting back solicitation requirement is in direct violation of the terms of the bid requirements. The proposals from both GovSolutions and ODG discuss how the bidders intends to track and bring furniture into facilities, without addressing existing furniture. Yet, GovSolutions received two points for its response while ODG received none. Again, the group of four awardees submitting the same proposal failed to answer the question entirely but received maximum points.

Next, the VA gave the Russell Group's Service Narrative all six available points for its answers to the question "Did the Contractor describe the process of inventory, cataloging and protecting VA property at the contractor's storage facility?" Appx86-87. In awarding the points, the agency pointed to page 18 of the SOW narrative. However, on page 18 of the Russell Group's SOW narrative, the words "inventory" and "cataloging" do not appear. Appx95. In fact, the words "inventory" and "cataloging" do not appear anywhere in the SOW narrative. The only reference to "protecting" on page 18 of Russell Group's SOW narrative is the following phrase, "Once a delivery date has been established between DLPPP and the VA COR our team will ready the site, protect required finishes, and install product per the signed layouts." Id. There is no mention of the materials or methods that will be used to protect VA property or the furniture. Conversely, the VA gave ODG's proposal zero points for its response to the same question: "Project Manager and Installation Supervisor ensure that all personnel working the job site adhere to the rules outlined for each particular installation site including the placement of all proper building protection prior to furniture delivery, proper removal of all trash, and proper cleaning of space upon completion." Appx60.

The SSA Source Selection even acknowledges these irregularities. For example, under A. Pomerantz's evaluation, the SSDD states "The Offeror did not

describe the process of inventory, cataloging and protecting VA property at the contractor's storage facility required by question 3." Appx99. The evaluation spreadsheet also listed zero points for A. Pomerantz's offer under the SV1 section. Appx100. However, that question is repeated two more times on the spreadsheet and the SSA inexplicably gave A. Pomerantz two points for each subsequent question. Id.

Thus, the SSA disparately evaluated ODG's proposal and held its proposal to a more exacting standard in comparison to the other proposals that received awards.

**Example Three:**

**Solicitation Key Element:** "Describe the process of protecting VA property (building) during installation. Include any materials that will be used to protect the building, architectural elements, and finishes or previously installed furniture." Appx20.

**ODG Response:** Project Manager and Installation Supervisor ensure that all personnel working the job site adhere to the rules outlined for each installation site including the placement of all proper building protection prior to furniture delivery, proper removal of all trash, and proper cleaning of space upon completion. Appx59.

The SSA also commented, regarding A. Pomerantz's proposal, "The Offeror did not provide a description of materials used and how they are applied to properly protect VA property during an installation required by question 5." The SSA actually withheld the points under SV1. Appx100. However, the SSA awarded A. Pomerantz two points in response to the identical question under SV2.

Id. Nothing changed. Again, nowhere did A. Pomerantz provide the necessary answer to the question later in its proposal. Yet, it still received 4 to 6 points for not providing the requested information. ODG at least provided an all-encompassing answer to the question, recognizing the issue and generally explaining that the company would properly handle the VA's existing furniture. However, ODG earned zero points. As such, the SSA disparately evaluated ODG's proposal and held the company to a more exacting evaluation standard.

> **Example Four:**
>
> **Solicitation Key Element:** Describe process for making corrections during final walkthrough and documenting punch list items with COR. Appx20.
>
> **ODG Response:** Perform punch walk with onsite client, if applicable. Appx59. Punch item lead times. Appx63. Coordinate a post installation walk through; A Punch List Report that identifies with Project Manager and Installation outstanding deficiencies; Supervisor to identify outstanding issues; A Plan for Resolution to include target dates of completion; A written Confirmation of Completion. Appx58.

Here, ODG notes that it will coordinate and conduct a post installation walk through. A. Pomerantz notes the same, stating in multiple places: "will do walkthrough with COR." Appx65. (That proposal does not expand any further on the matter. GovSolutions also notes that it will perform a walkthrough without further describing its means or methods. Appx102. The four awardees with the identical proposal provide comparable information: "PM and installation manage walk site before install to note existing damages" and "Site PM conduct a pre-

20

punch walk through." Appx107, Appx116. The SSA awarded each of these proposals

points for answering in similar fashion to ODG. This, again, demonstrates that the

SSA held ODG to a more stringent standard that other offerors.

**Example Five:**

**Solicitation Key Element:** Describe Interior Designer's experience and qualifications working on healthcare facilities and what hardware and software that will be used to produce digital and hard copy drawings of design work and prepared installation drawings. Appx20.

**ODG Response:** "We have been in business for over 18 years with a talented staff that has over 100 years of experience in product procurement, design, project management, dispute resolution and installation." Appx62. **"**We will have a team dedicated to handling all projects from design through installation. They will be responsible for reviewing each order and familiarizing themselves with your expectations." Id. **"**Our Design Manager will be point of all design meetings and deliverables. She has over 18 years of design experience and specializes in the Healthcare area. Appx63. Evidence Based Design. Patient centered design is transforming our industry, with healthcare spaces being designed to support the health and recovery process of patients, and to improve the working lives of caregivers, staff and patient families. Our entire team understands the importance of creating a warm and welcoming environment from the patient room through the waiting and cafeteria areas all the way to the doctors' offices and nurses' stations. Navigating through a hospital has the potential to be a safe experience, with areas that support multiple functions and interactions, and with furniture and finishes that invite patients and families to stay for treatment, or for longer periods of recovery. We carry leading healthcare product lines that are outstanding not only for their aesthetic and functional characteristics, but because they cater to the needs of a multifunctional, and clean environment. Appx55-56. Interior Designer has at least 10 years of experience. Appx59.

Here ODG notes that the lead designer has more than 18 years of

experience and specializes in the healthcare industry. Appx72. All other

designers have a minimum of 10 years of experience. While A. Pomerantz's proposal mentioned the specific software used by its interior designers it fails to mention experience specific to the federal or healthcare industry. This is another example in which A. Pomerantz received points for its vague response and ODG received zero points for a more detailed answer.

**Example Six:**

**Solicitation Key Element:** Describe the experience of the installation staff and Interior Design staff regarding work in a federal facility and healthcare facility. Address their knowledge regarding life safety codes, infection control standards and patient privacy standards. Appx20.

**ODG Response:** Our Design Manager will be point of all design meetings and deliverables. She has over 18 years of design experience and specializes in the Healthcare area. Appx62. Our projects have enabled us to outfit spaces in many markets including education, healthcare, hospitality and corporate offices. Appx55. Patient centered design is transforming our industry, with healthcare spaces being designed to support the health and recovery process of patients, and to improve the working lives of caregivers, staff and patient families. Our entire team understands the importance of creating a warm and welcoming environment from the patient room, through the waiting and cafeteria areas all the way to the doctors' offices and nurses' stations. Navigating through a hospital has the potential to be a safe experience, with areas that support multiple functions and interactions, and with furniture and finishes that invite patients and families to stay for treatment, or for longer periods of recovery. Appx55-56. The VA will have access to manufacturers who offer options for ergonomic, secure, safe, sustainable and LEED credit-generating products. Appx55. Healthy Interior Environments — another area of increased interest in healthcare design is infection control. Our manufacturing partners provides a number of durable antimicrobial fabrics and furniture finishes which can help to improve hospital infection control. We also carry lines of furniture which comply with low emissions, helping to create a healthier indoor environment. Appx56.

The SSA found ODG's responses inadequate and, thus, awarded it zero points. However, the SSA found A. Pomerantz adequately described the experience of its staff with handling life safety code, infection control standards, and patient privacy standards and awarded the company full points. Appx100. For example, Attachment 15, Question 24 asks:  Did the Contractor describe the experience of the staff regarding life safety code, infection control standards, and patient privacy standards?  The only mention of life or safety in the A. Pomerantz proposal is the following:

> "Azalea [A. Pomerantz's identifier] is familiar with life and safety requirements. We are aware and capable to adhering to any life and safety requirements. An example is our relationship with TD Bank. The installation company has handled life and safety product for TD Bank. They have TWIC card carrying employees so they can access Sunoco Refineries and have taken the safety course attached to the TWIC application process. As we are in hospitals and pharmaceutical facilities daily, we are very familiar with infection control and patient privacy. We have also completed the Green Security Process at CHOP, which involved Hospital Safety, Drug Testing, Background Checks and HIPAA Training, as well as Immunization & Screening.

Appx65-66.

Simply being familiar with something does not translate to describing the qualifications and experience of its staff. In fact, A. Pomerantz does not describe the experience of its staff at all, beyond stating that they have worked in hospitals and received training. Pomerantz does nothing more than restate the evaluation criteria combined with a conclusory statement that "Their [A Pomerantz's staff]

combined years of training and expertise of more than 28 years led them to ensure compliance of the life safety code, infection control standards and patient privacy standards." Appx61. However, A. Pomerantz still received six points, half of ODG's *total* point award in their technical proposal, for this generic statement that completely avoided answering the question posed. The VA has never explained why A. Pomerantz's bald assertion satisfies the evaluation requirement to "describe" and the information supplied by ODG does not. Further, the SSA, in its excel spreadsheet accompanying A. Pomerantz's Attachment 15 evaluation review, states that the relevant information pertaining to the subject question can be found on Page 7, under the SV3 section. However, Page 7 of A. Pomerantz's SOW narrative does not mention life safety codes, infection control, or patient privacy. Still, the SSA awarded points based on A. Pomerantz's responses on this page. Appx100-101.

While ODG primarily cites the A. Pomerantz proposal for comparison, the AR contains many more instances of unequal and disparate evaluation. For example, SDV Office Systems, Johnson Danforth, Cuna Supply, and Coronado[7] each received all six available points in response to the question, "Did the Contractor describe the experience of the staff regarding life safety code, infection control standards, and patient privacy standards?" despite their proposals failing to

---

[7] These are the proposals that ODG pointed to that are virtually identical.

contain the words "privacy" or "life safety." ODG responded at least as substantially in its SOW narrative when it stated "another area of increased interest in healthcare design is infection control. Our manufacturing partners provides a number of durable antimicrobial fabrics and furniture finishes which can help to improve hospital infection control." Appx55. However, the SSA afforded ODG zero points for this response.

JPL also received six points for this statement:

> Our training includes reviewing changes and updates to Life Safety Codes, Infection Control Standards and HIPPA Privacy Rule. For the majority of our projects, our personnel have successfully completed the VA Privacy and Information Security Awareness and Rules of Behavior seminar and have received Certificates of Completion. Note that we have the Infection Control Standard Precautions in Health Care flyer and checklist published by the World Health Organization posted in our office and electronically available to our staff as we frequently service healthcare facilities.

Appx117. This statement simply does not answer the question posed. But again, ODG received zero points related to this criterion, despite describing its Key Personnel's experience related to this matter in detail.

Finally, the SSA awarded Russell Group's SOW narrative six available points for its response to the question, "Did the Contractor describe the experience of the staff regarding life safety code, infection control standards, and patient privacy standards?" Appx86-87. The evaluation spreadsheet referred to page 11 of Russell's SOW narrative. That page contains the following phrase, "The design

team has been carefully selected to provide extensive knowledge of working in a

healthcare facility. Their understanding of ADA compliance, life safety codes,

infectious diesease (sic) control standards and patient privacy will give the VA the

specific expertise required to work through each task order." Appx88. This

statement provides yet another example of the SSA awarding points for a general,

generic response. However, when ODG was equally general, or even much more

detailed, it was not awarded equal points. The SSA unfairly failed to award ODG

*any* points for its detailed responses above, showing again that the proposals were

not evaluated equally and fairly.

**Example Seven:**

**Solicitation Key Element:** Describe technical capabilities of staff producing
AutoCAD/and or PDF drawings of the as-built furniture installation.
Appx20.

**ODG Response:** Generate a design solution for the new Test-Fit Plans with
verified critical furniture layout and verify critical dimensions, data, and
outlet locations to ensure that the furniture will fit in the space Installation
Drawing Package in hardcopy allotted and electronic format that includes
critical hold-to dimensions as needed. Appx58. Follow-up with End Users to
identify any user A set of As-Built Drawings that highlights adjustments or
design changes post-install changes to the space after initial installation. Id.
Installation Supervision - A qualified Installation Supervisor is assigned to
every installation project for overseeing moving crews, installation crews,
proper delivery of all products and ensuring that product is delivered and
installed per the approved installation drawings. Appx60. We carry leading
healthcare product lines that are outstanding not only for their aesthetic and
functional characteristics, but because they cater to the needs of a
multifunctional, and clean environment. Appx57. Installed per the approved
installation drawings. Appx60.

As evidenced from the ODG Responses above, the proposal's SOW clearly demonstrates the Company's ability to meet all the services as defined by the SOW. Had the VA awarded ODG the points it rightfully earned the company total would easily surpass the 39 points necessary to achieve an "Acceptable" rating. Based on ODG's overall scores for other factors, even an Acceptable rating would give the company a substantial chance of receiving an award. Further, while the Solicitation lists some "Key Elements," the VA failed to warn offerors that a failure to provide "complete details" in response to Attachment 15 would result in a finding that their proposals were technically unacceptable. This is especially salient given the fact that ODG's response to the Sample Project was rated "Outstanding." This portion of ODG's responses, along with its Satisfactory past performance, should have provided sufficient evidence that ODG could satisfy all the requirements of the SOW.

Even a cursory review of the awardee proposals shows that each contractor provided similar, if not even more generic and broad, responses, to the Key Elements. While the VA allowed for the awardees to provide vague and imprecise responses, it held ODG to a very exacting standard. A mere mention of the items listed in the Evaluation Criteria or Evaluation Worksheet in the awardee's proposal was sufficient for the SSA to award points. However, the SSA commented several times that ODG's proposal did not contain "any

information" regarding a requirement, when in fact, as shown in detail above, the proposal included responses similar to the awardees but received no points on the rubric scale--a scale the VA employed, but never mentioned in the original solicitation or in its corrective action.

As discussed above, the SSA source selection document acknowledges these irregularities, noting that awardees failed to provide necessary details, listed ambiguous answers, or provided vague descriptions. Yet, SSA still awarded these bidders points; whereas the agency provided ODG zero points for extremely similar responses.

The VA held ODG to an unfair and inconsistent standard and failed to properly evaluate its proposal fairly and in accordance to the stated criteria. This failure shows the agency's decision was arbitrary and capricious.

## CONCLUSION

For the reasons set forth above, Appellant respectfully requests that this Court reverse COFC and determine that the VA acted in a manner that (1) was arbitrary, capricious, contrary to law, and lacked a rational basis; and (2) failed to evaluate ODG's proposal fairly and equitably.

Respectfully submitted,

/s/Joe Whitcomb
Joe Whitcomb, Esq.
WHITCOMB, SELINSKY, McAULIFFE, PC
2000 South Colorado Blvd.

Tower One, Suite 9500
Denver, CO 80222
Telephone: (303) 534-1958
Facsimile: (303) 534-1949
E-mail: joe@whitcomblawpc.com

Timothy Turner
tim@wsmlawpc.com

Attorneys for Plaintiff-Appellant Office Design
Group, Inc.

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

Certificate of Compliance with Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(C) because:

[X] This brief contains  7520 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I relied on MS Word's word count
for this certification.

2. This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using
MS Word in Times New Roman 14-point font, except for longer quotes.

Date: February 19, 2019

/s/Joe Whitcomb
Joe Whitcomb, Esq.
WHITCOMB, SELINSKY, McAULIFFE, PC
2000 South Colorado Blvd.
Tower One, Suite 9500
Denver, CO 80222
Telephone: (303) 534-1958
Facsimile: (303) 534-1949
E-mail: joe@whitcomblawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 28, 2019, I served a copy of the foregoing electronically with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

J. Bradley Reaves, -: brad.reaves@reavescoley.com
Tanya Koenig: tanya.b.koenig@usdoj.gov, natcourts.dockets@usdoj.gov
Matthew Thomas Schoonover, Attorney: mschoonover@koprince.com,

# United States Court of Federal Claims

No. 18-1147C
Filed: October 26, 2018
(Filed Under Seal)

---

**OFFICE DESIGN GROUP,**

     *Plaintiff*,

     **v.**

**UNITED STATES OF AMERICA,**

     *Defendant,*

**and**

**CUNA SUPPLY LLC** *et al.*,

     *Defendant-Intervenors*.

---

*Joseph A. Whitcomb*, Whitcomb Law PC, Denver, Colorado, for plaintiff.

*Tanya Beth Koenig*, United States Department of Justice, Washington, D.C., for defendant.

*Matthew Thomas Schoonover*, Koprince Law LLC, Lawrence, Kansas, for defendant-intervenor, Cuna Supply LLC.

*John Bradley Reaves*, ReavesColey PLLC, Chesapeake, Virginia, for defendant-intervenor, GovSolutions, Inc.

## ORDER AND OPINION

**HODGES**, Senior Judge.

     Plaintiff, Office Design Group, brings this post-award bid protest against the Department of Veterans Affairs, contending that the VA failed to assess its proposal

pursuant to the stated evaluation criteria, disparately evaluated its proposal, failed to maintain the anonymity in its evaluation process, and turned a blind eye to contractor collusion. Plaintiff therefore seeks a declaratory judgment that the VA's evaluation process was arbitrary and capricious and in violation of Federal Acquisition Regulation. Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, the parties, including defendant-intervenor, Cuna Supply LLC, have each filed a motion for judgment on the administrative record and several reply briefs.

For the following reasons, we deny plaintiff's motion and grant defendant and defendant-intervenor's cross-motions for judgment on the administrative record.

## BACKGROUND

This bid protest concerns the award of multiple "indefinite delivery/indefinite quantity" (IDIQ) contracts by the VA. The Requests for Proposals (RFP) sought bids to provide healthcare furniture and related services for VA facilities in five regions across the country.[1] The RFP or solicitations contemplated awarding three to five IDIQ contracts in each region, but expressly reserved the discretion to exceed that number. The solicitations established that awards would be made using a best-value trade off selection process considering three primary evaluation factors: Technical Capability, Past Performance, and Price. For evaluation purposes, the VA deemed Technical Capability more important than Past Performance and Past Performance more important than Price.

Plaintiff's claims focus on the Technical Capability evaluation factor, namely the third of four technical evaluation sub-factors, which provides that the "Government will evaluate the contractor's Service Narrative to be able to meet all services as defined in the Statement of Work." Compl. Ex. 1 at 33 (quoting RFP). The RFP further provides that a contractor must cover all services required under four line items with contract tasks and requirements specified in each: (1) Furniture, Design, and Installation Support Services; (2) Installation and Reconfiguration Services; (3) Industrial Design Services; and (4) Advanced Project Management Turn-key Services with Furniture.

The RFP then lists eight "key elements" that need to be met and provides that: "An 'Unacceptable Rating' for any Technical Section will result in an overall 'Unacceptable'

---

[1] The parties have agreed that the administrative record should only contain one of these solicitations.

rating for the Technical Factor." *Id.* at 34 (quoting RFP); *see also* Admin. R. Attach. 5 at AR 1522 (stating that out of sixty-six points total, a score of thirty-nine points or below would be rated unacceptable).[2] The RFP also included Attachment 15, entitled "Service Technical Evaluation Questions." Attachment 15 is a questionnaire that contains the service requirements from the Statement of Work and essentially mirrors key elements found in sub-factor three. It is the checklist to evaluate technical proposals and is "informational only." Admin. R. Attach. 6 at AR 2023 (quoting amended RFP Questions and Answers).

The RFP advised contractors not to include any company identifying information, as any reference to their company would be redacted for anonymity. *Id.* at AR 1988. Bidders were to use their assigned company identifier.

Plaintiff submitted a proposal for all five regions. The VA found that plaintiff's technical proposal was unacceptable because it did not provide complete details or support on several questions. Compl. Ex. 2. After the VA had conducted a formal debriefing via telephone, plaintiff filed a GAO bid protest. The GAO dismissed plaintiff's protest as "academic," because the VA had indicated that it would take corrective action by reopening the procurement and reevaluating plaintiff's proposal.

The VA's reevaluation, however, again found plaintiff's technical proposal unacceptable, giving it a score of twelve for sub-factor three. Admin. R. Attach. 6 at AR 2193-2194 (stating that under sub-factor three Attachment 15, plaintiff's "response to the service technical requirements missed the majority of the requirements"). The awards were

---

[2] The key elements to be addressed can be summarized as follows: (a) provide a staffing plan with qualifications and experiences working in healthcare for key personnel; (b) describe process of inventory, cataloging, and protecting existing VA furniture; (c) describe process of protecting VA property; (d) describe process for making corrections during final walkthrough; (e) describe process for warranty repairs; (f) describe interior designer's experience working on healthcare facilities and what hardware and software will be used to produce drawings of design work; (g) describe technical capabilities of certain staff; and (h) describe experience of the installation staff and interior design staff regarding work in a federal and healthcare facilities, namely their knowledge regarding safety codes, infection control standards, and patient privacy standards. Compl. Ex. 1 at 33-34 (stating key elements).

issued to several other companies, including defendant-intervenors, Cuna Supply and GovSolutions. Thereafter, plaintiff filed a protest with the GAO, which was denied.

Plaintiff filed a Complaint before this court and a motion for judgment on the administrative record maintaining that the VA: (1) disparately evaluated its proposal under the stated evaluation criteria and that this failure was arbitrary and capricious and in violation of FAR; (2) failed to maintain anonymity in its evaluation process; and (3) turned a blind eye to contractor collusion. Defendant and defendant-intervenor, Cuna Supply, have each filed a motion for judgment on the administrative record challenging those claims and seeking judgment in their favor.

## LEGAL STANDARD

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the RCFC, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Because the court makes factual findings from the record evidence, judgment on the administrative record is akin to an expedited trial on the record. *See Bannum*, 404 F.3d at 1356 (adding that the statute conferring jurisdiction over bid protests requires the court to give "due regard" to expedited resolution of the action).

Bid protest cases are reviewed under the standard established in the Administrative Procedures Act, 5 U.S.C.A. § 706. *See* 28 U.S.C. § 1491(b)(4) (referring court to 5 U.S.C.A. § 706). An agency's procurement decisions will be upheld unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ceres Envtl. Servs., Inc. v. United States*, 52 Fed. Cl. 23, 33 (2002) (quoting § 706(2)(A)). To make such a showing, a plaintiff must demonstrate that (1) the agency's decision lacked a rational basis or (2) that it involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (adding that the plaintiff bears a heavy burden and that the test on the first ground is to determine whether the agency provided a coherent and reasonable explanation of its exercise of discretion).

When a challenge is brought on the second ground, the plaintiff must show a "clear and prejudicial violation of applicable statutes or regulation." *Id.* at 1333 (quotation and citation omitted).  To demonstrate prejudice, the plaintiff must show a substantial chance that it would have received the contract award but for that error. *Elec. Data Syss., LLC v.*

*United States*, 93 Fed. Cl. 416, 429 (2010) (citation and quotation omitted). In the context of a multiple-awardee IDIQ contract, "prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error 'might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether.'" *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 366 (2009) (quoting *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008) (stating that the "slightest shifting of a single adjectival rating could have significant impact not only on the ranking of a given protester, but also on who they might be compared with in a tradeoff analysis" (quoting *Serco Inc.*, 81 Fed. Cl. at 501)).

# DISCUSSION

Plaintiff's motion for summary judgment on the administrative record must be denied; defendant and defendant-intervenor's cross-motions are granted for the following reasons:

    1.  <u>The VA Provided a Coherent and Reasonable Explanation for Denying Plaintiff's Proposal</u>

Plaintiff contends that the VA's decision lacked a rational basis because it included all the information required to meet sub-factor three. To support its claim, plaintiff reexamines each of the eight key elements of the service narrative.

Plaintiff's service narrative did not include all the information required to meet sub-factor three. An offeror bears the burden of presenting an adequately written proposal that satisfies the requirements of the solicitation. *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017) (quotation and citation omitted). A significant part of plaintiff's contention in this regard is that the VA improperly relied on Attachment 15 as a rubric to evaluate the proposals. Plaintiff contends that the VA should have confined itself to the RFP, which stated that proposals would be evaluated on their ability "to meet all services as defined in the Statement of Work." Compl. Ex. 1 at 33 (quoting RFP).

Contrary to plaintiff's contention, however, the amended solicitation provided a set of Questions and Answers, which stated that Attachment 15 "will be used to evaluate the technical proposals." Admin. R. Attach. 6 at AR 2023 (quoting RFP); *see also Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 532-33 (2010) ("[A] solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." (citation omitted)). The VA's reliance on Attachment 15 was therefore consistent with the solicitation.

The VA assessed plaintiff's proposal a score of twelve out of sixty-six points because its proposal under sub-factor three did not provide complete details or support on several questions. This court does not sit as a "super" Source Selection Authority to second guess agency procurement decisions. *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 308 (adding that the court will "not second guess the minutiae of the procurement process in such matters as technical ratings") (quotation and citation omitted)). As developed further below, the VA made a rational determination and provided a coherent explanation, when it remarked *inter alia* that plaintiff's bid was "[v]ery generic on staffing, experience; No inventory, cataloging or protection of VA property information . . . ; No info on AutoCAD or PDF . . . ; No info on staffing having knowledge of life safety, infection control and HIPPA." Admin. R. Attach. 6 at AR 1952 (stating VA remarks). The VA properly exercised its discretion to deny plaintiff's proposal.

### 2. The VA's Decision Did Not Involve a Clear and Prejudicial Violation of Regulation or Procedure

Plaintiff claims that: (i) the VA disparately evaluated its proposal and held it to a more exacting standard than other offerors; (ii) failed to maintain anonymity in its evaluation process; and (iii) turned a blind eye to contractor collusion. We disagree.

#### i.    Claim Regarding Disparate Evaluation

Plaintiff contends that a comparison of some of the other awardees' service narrative reveals equivalent service narratives that were assigned more points. *See* Pl.'s Mot. J. Admin. R. at 9-27 (discussing key elements and comparing plaintiff's service narrative to that of other offerors). Plaintiff maintains that such disparate treatment is proof of the VA's arbitrary and capricious evaluation.

Plaintiff's comparative analysis of various offerors' service narratives points to several inconsistencies in the VA's evaluations; however, these are not sufficient to demonstrate that the VA's decision involved a clear and prejudicial violation of regulation or procedure and was therefore arbitrary and capricious. An agency's decision is unreasonable if it downgrades "technical proposals for deficiencies that are **substantively indistinguishable** from those found in the proposals of the other offerors who remained in the competitive range." *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012) (emphasis added) (citation omitted); *see also TLT Const. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001) (stating that when evaluation factors are listed in the RFP, they must be applied to each proposal consistently) (citing 10 U.S.C. § 2305 (1999)).

The VA properly exercised its discretion in finding that plaintiff's service narrative was not comparable to the awardees' proposals. Where an offeror alleges unequal treatment, it must demonstrate that the differences in evaluation did not accurately reflect

actual differences between the awardees' proposals. *Dismas Charities, Inc. v. United States*, 61 Fed. Cl. 191, 205 (2004) (quotations and citation omitted). Where comparably detailed proposals are not submitted, the agency has no basis to find comparable weaknesses. *See Paragon Syss., Inc.; SecTek, Inc.*, B–409066.2, B–409066.3, June 4, 2014, 2014 CPD ¶ 169 at *7 (finding different rating reasonable based on differences in proposals).

Defendant demonstrates that plaintiff did not meet its high burden of establishing that the VA's evaluation was unreasonable and prejudicial. *See Elec. Data Syss.*, 93 Fed. Cl. at 429 (stating that the focus of the standard is on the reasonableness of the agency result, rather than its correctness). For instance, with respect to:

(a) the staffing plan and key personnel — plaintiff contends that other offerors received two point credits for their staffing plan, despite not providing an adequate response or a response to each line item. However, the record reveals that plaintiff submitted a staffing plan that could not be compared to others; in particular, saying little of the staff's qualifications in healthcare. Moreover, the comparators' proposals were more responsive and descriptive. *See* A. Pomerantz, Veteran Office Design, the Russell Group, and the four alleged colluders.[3] The VA's point credits were not unreasonable;

(b) the process used for protecting and cataloging VA furniture — plaintiff contends that it provided a plan for protecting existing furniture and intended to provide a list of materials that would be used to protect the furniture once in its possession; whereas, another offeror and the alleged colluders did not provide a plan for existing furniture, yet they received two points. Whether all the awardees' proposals responded directly to the solicitation is not clear. Plaintiff concedes that it did not respond to this requirement and relies on the unsupported assertion that it is normal practice to provide such a plan once the VA issues a task order. The VA was not unreasonable in exercising its discretion to award credit to the awardees' responses;

(c) the protection of VA's real property — plaintiff contends that it generally explained that it would handle the VA's property and that awardee, A. Pomerantz, was credited two points in line item two, despite the VA finding that it had not provided a description of materials used and how they would protect the VA's property in line item one. Even if this is correct, plaintiff

[3] The four alleged colluding parties are SDV Office Designs, Johnson Danforth, Cuna Supply, and Coronado Distribution.

does not establish how this error is prejudicial given the inadequacies of its own proposal in neglecting to include an indication of the materials it planned to use. A. Pomerantz received an "outstanding" rating consisting of sixty-two points for sub-factor three. If the VA's assessment was erroneous, that would not diminish or eliminate A. Pomerantz as an awardee. The VA's decision therefore was not unreasonable and/or prejudicial;

(d) the interior designer's experience working on healthcare facilities and the hardware and software used to producing drawings — plaintiff maintains that its proposal states that its "design manager" has eighteen years of experience in healthcare, but plaintiff's proposal also states that its "interior designer" has ten years of experience, without specifying the nature of the experience. Defendant maintains, without explanation, that a distinction exists between the terms. Plaintiff neglected to describe the hardware and software that its designer planned to use. The VA's point credits were not unreasonable;

(f) the technical capabilities of staff — plaintiff contends that its proposal demonstrates its ability to fulfill the required services. Yet, the record reveals that plaintiff's proposal does not address the technical capabilities of its staff to use AutoCAD or PDF to produce drawings, as required. The VA's decision therefore was not unreasonable; and

(g) the experience of installation and design staff working on federal and healthcare facilities — plaintiff argues that its proposal discussed the experience of its staff in these facilities and that its generic responses were penalized; whereas, other offerors' responses were not. The record shows that plaintiff's proposal does not address whether its staff had knowledge of and experience with safety codes, infection control standards, and patient privacy standards. The VA's decision therefore was not unreasonable.[4]

Plaintiff does not establish that, but for the VA's alleged error, it had a substantial chance of winning a contract. *See Octo Consulting Grp., Inc. v. United States*, 124 Fed. Cl. 462, 467-68 (2015) (stating that the prejudice inquiry focuses on the effect of the government's error on the plaintiff's chances of being awarded the contract). In finding that defendant's evaluation was not arbitrary and capricious, we are mindful that the agency is not required to search for information to render plaintiff's proposal responsive to the

---

[4] Plaintiff's proposal regarding the element requiring a description of the final walkthrough and punchlist process was not marked as deficient. Defendant, moreover, states that the "parties agree that [plaintiff] satisfied this requirement." Def.'s Mot. J. Admin. R. at 25.

solicitation if it is not included in the correct part of the proposal. *See IBM Corp. v. United States*, 101 Fed. Cl. 746, 758-59 (2011) (citation omitted) (stating that agency is not required to search proposal for information bearing on identified weaknesses). The VA's decision did not involve a clear and prejudicial violation of regulation or procedures.

> ## ii. *Claim Regarding Failure to Maintain Anonymity in Evaluation*

Plaintiff contends that the VA failed to maintain the anonymity designed to ensure fairness and equality of the evaluation process. In support, it asserts that several offerors' names appeared unredacted in their proposals or proposal metadata. An agency has the discretion to reject offers that do not comply with redaction requirements. *Strategic Bus. Solutions, Inc. v. United States*, 129 Fed. Cl. 621, 628 (2016), *aff'd*, 711 Fed. Appx. 651 (Fed. Cir. 2018). However, plaintiff does not address the key issue of whether it had a substantial chance of receiving the contract award, but for those errors. *Cf. Elec. Data Syss.*, 93 Fed. Cl. at 429 (stating that a violation of procedures requires a showing of prejudice); *see also Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 329 (2015) (stating that there is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids"). Plaintiff neglects to explain whether its own failure to redact its company identifiers from its proposal compromised the fairness and equality of the evaluation process. Plaintiff has not established a prejudicial violation of procedures in connection with this procurement; therefore, we must reject its claim.

> ## iii. *Claim Regarding Contractor Collusion*

Plaintiff maintains that the VA turned a blind eye to contractor collusion in violation of 48 C.F.R. § 3.303, which deals with reporting suspected antitrust violations. Plaintiff states that four awardees provided virtually identical Statement of Work narratives and received almost identical marks. Pl.'s Mot. J. Admin. R. at 33 (adding that it asked the VA to refer this matter to the Department of Justice pursuant to 48 C.F.R. §§ 3.301(b), 3.303(d)). In response, defendant-intervenor maintains that plaintiff has not shown a link between the alleged collusion and the VA's evaluation and award. Defendant states that the VA was reviewing the matter, which was referred to the Department of Justice. Meanwhile, plaintiff has provided no authority preventing the VA from proceeding with the awards despite these suspicions, nor has it sought to enjoin such awards.

If proven, collusion arguably could prejudice an offeror's chance of obtaining an award. Proving collusion, however, is not the VA's responsibility; it must do what it did: refer the matter to the Department of Justice. The VA's decision not to dismiss the suspected colluding offerors, but refer the matter to DOJ, is not a violation of regulations or procedures. Plaintiff's claim that the VA acted arbitrarily and capriciously is without merit.

# CONCLUSION

Plaintiff's motion for judgment on the administrative record is **DENIED**. Defendant and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**. No costs.

**IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*

Robert H. Hodges, Jr.
Senior Judge

**Appx0000010**